UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ANA QUINONES, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | CIVIL ACTION |
| ) | NO. 12-10120-JGD |
| UNITED STATES POSTAL ) | |
| SERVICE, ) | |
| ) | |
| Defendant. ) | |

# FINDINGS OF FACT AND CONCLUSIONS OF LAW

March 29, 2013

DEIN, U.S.M.J.

## I. INTRODUCTION

The Plaintiff, Ana Quinones, was injured in a motor vehicle accident on June 5, 2009, when she was passing a United States Postal Service ("USPS") truck on the left, and her vehicle collided with a car driven by Halina Mitura.[1]  Quinones claims that the driver of the USPS truck, Robert Leal, was negligent and caused her injuries, pain and suffering, and damage to her vehicle.

USPS contends that it was not negligent because its driver did not breach his duty of care under the circumstances surrounding the motor vehicle accident.  Instead, it argues that Quinones herself caused the accident by violating various Massachusetts driving statutes and regulations. In the alternative, if this court finds USPS negligent, the

---

[1] Halina Mitura and Mitura Fishing Corporation, the owner of the truck, were originally defendants in this action and were dismissed with prejudice on February 5, 2013. (Docket No. 44).

government asserts that Quinones was more than 50% negligent, thereby barring her recovery under Mass. Gen. Laws ch. 231, § 85.

The bench trial of this matter took place on February 25, 2013. Three witnesses testified, and twenty exhibits were introduced. After the trial, both parties submitted revised proposed findings and rulings. This court has reviewed the evidence, exhibits and the parties' submissions. Based on the evidence presented, the court makes the following findings of fact and rulings of law. As detailed herein, this court finds that the Plaintiff has failed to prove by a preponderance of the evidence that the driver of the USPS truck was negligent. Therefore, judgment shall be entered in favor of the Defendant and this case shall be dismissed.

## II.  FINDINGS OF FACT[2]

### Background

1.   The Plaintiff, Ana Quinones ("Quinones"), lives in Taunton, Massachusetts. As of the date of the accident, Quinones had lived in Taunton for eleven years, and during that time made monthly trips to Mill River Plaza for her children's doctor's appointments and prescriptions. (PF ¶ 7).

---

[2] Plaintiff's Revised Proposed Findings of Fact and Rulings of Law (Docket No. 54) are cited as "PF," and Defendant's Amended Proposed Findings of Fact and Conclusions of Law (Docket No. 55) are cited as "DF." The court has reviewed the evidence, exhibits, and all submissions in their entirety, and a reference to the proposed findings does not mean that the court adopts the complete text of the proposed findings. Exhibits from the trial are cited as "Ex."

2.  An access road runs through the Mill River Plaza parking lot ("access road").  Drivers often use the narrow access road to save time and avoid street lights on the busier adjacent Washington and Cohannet Streets.  (PF ¶¶ 2-3; DF ¶¶ 1, 3).

3.  Mill River Plaza houses the Registry of Motor Vehicles ("RMV") as well as various medical offices and restaurants.  There are frequent accidents on the access road due to both vehicular and pedestrian congestion.  (PF ¶¶ 4-5, 16).

4.  In 2009, the access road was 38.5 feet wide with two moving lanes of traffic in opposite directions and one fire lane, which was 8.5 feet wide.  The fire lane was located on the right side of the road heading towards Cohannet Street, across the street from the entrance to a Dunkin Donuts parking lot.  There were no stop signs at any point along the access road.  (PF ¶¶ 10-13; DF ¶ 2.  See also Ex. 4 (Affidavit of Mark Slusarz)).

### Circumstances Surrounding the Accident

5.  On June 5, 2009, there was high vehicle and pedestrian traffic on the access road.  (PF ¶ 17).

6.  Quinones was driving on the access road around approximately 2:05 p.m. on her way home from picking up prescriptions for her children at a nearby Walgreens pharmacy.  (PF ¶¶ 1, 6; DF ¶¶ 1, 3).

7.  Quinones was driving a Saturn station wagon which was approximately 5.7 feet wide without mirrors.  She had exited the pharmacy parking lot and crossed Washington Street to enter the access road, and was driving in the direction of Cohannet Street at a speed of approximately fifteen to twenty miles per hour.  She took the access

road as a shortcut in order to get home to her children more quickly. (PF ¶¶ 14, 23, 26; DF ¶¶ 1, 3).

8. Halena Mitura ("Mitura") was driving a Ford pickup truck owned by Mitura Fishing Corp. which was approximately 6.7 feet wide without mirrors. I find that she had pulled out onto the access road from the RMV and was driving in the direction of Washington Street, towards Quinones. (PF ¶¶ 15, 22-23; DF ¶¶ 1, 7).

9. There was testimony from Quinones at trial that Mitura was pulling out from an adjacent Dunkin Donuts parking lot immediately prior to the accident, in direct contrast to other witness testimony that Mitura was driving on the access road coming from the RMV. Quinones' testimony was so confused as to the location of Mitura's vehicle that I do not find it credible. Moreover, in Plaintiff's Revised Proposed Findings submitted after trial, she seems to accept that Mitura was on the access road coming from the RMV, and not exiting the Dunkin Donuts parking lot. (PF ¶¶ 23, 34, 47; DF ¶¶ 18-19).

10. Quinones does not speak English fluently, and had the assistance of a translator both at the scene of the accident and at trial. The court recognizes that the language barrier issue may have contributed to the inconsistencies in Quinones' testimony. However, even construing her testimony liberally, it is impossible to overlook the many discrepancies in her testimony.

11. Robert Leal ("Leal"), a USPS mail carrier, was driving a "long life vehicle" (LLV) – approximately 6.4 feet wide without mirrors and 8 feet wide with mirrors – on a mail delivery route near the Mill River Plaza. (PF ¶¶ 13, 18-19; DF ¶ 1). He has been a

USPS mail carrier for eighteen years. (Testimony of Robert Leal). The LLV was facing in the same direction as Quinones' vehicle, towards Cohannet Street. (PF ¶ 23; DF ¶ 4).

### The Location of Leal's LLV

12. As detailed below, there is disputed testimony regarding the location of the USPS truck prior to the accident. The Plaintiff contends that the truck was parked in the fire lane, which, she argues, is evidence of Leal's negligence. I find that the Plaintiff has failed to prove by a preponderance of the evidence that the truck was parked in the fire lane. Rather, based on the credible evidence, I find it more likely than not that the USPS truck was in the travel lane, preparing to make a left turn, when the Plaintiff attempted to pass the truck on the left.

13. Leal testified that he often visited the Dunkin Donuts located on the access road during breaks in his delivery route. He customarily would either park in the fire lane and cross the street on foot, or drive directly into the parking lot. He testified that on the day of the accident he intended to pull into the parking lot and was in the traffic lane waiting for a break in oncoming traffic to take a left, with his signal on, when Quinones passed him on his left. (PF ¶ 19; DF ¶ 4).

14. Quinones testified that she observed the USPS truck when she entered the access road, but that it was parked in the fire lane. She testified that she saw it pull out from the curb in a way that caused her to believe he intended to take a left into the Dunkin Donuts parking lot. When it did not continue to move after she honked her horn and stopped, she decided to pull around the truck. As she was passing the truck on the left, it

-5-

began again to pull out into the traffic lane, forcing her to cross over the middle of the road into the lane of oncoming traffic. (PF ¶¶ 20, 25-27, 29-31, 35; DF ¶¶ 7, 10-12; Testimony of Ana Quinones).

15.  Mitura testified that she observed the LLV in the traffic lane, stopped and waiting to take a left into the Dunkin Donuts parking lot, albeit without the left blinker turned on. She also testified that when Quinones attempted to pass the truck to its left, Mitura's truck was only 5-8 feet from the LLV, and the collision occurred. (PF ¶ 32; Testimony of Halina Mitura). This testimony is supported by Mitura's Motor Vehicle Crash Operator Report. (Ex. 11).

16.  Neither party presented evidence beyond eyewitness testimony regarding the position of the LLV before, during, and after the collision.

17.  There is no evidence that Leal was parked in the fire lane aside from Quinones' own testimony, which is directly contradicted by the testimony of Robert Leal and Halina Mitura. As detailed below, the testimony of Leal and Mitura has remained constant since the accident, while the Plaintiff's description of events has varied dramatically. Moreover, I find that there is no benefit to Mitura to place the USPS truck in any specific location prior to the accident. For these and the other reasons discussed below, I find that the USPS truck was not parked in the fire lane, but rather was in the normal lane of traffic waiting to turn left into the Dunkin Donuts parking lot when Quinones attempted to pass the truck.

18. Leal and Mitura's testimony has remained consistent with the statements they provided to Officer Steven Burns on the date of the accident. According to Officer Burns' Police Report (Ex. 18), Mitura stated: "While I was traveling straight ahead, the other vehicle swerved around the mail truck into my lane and struck the back of my vehicle." This statement is consistent with her testimony at trial. Leal provided the following statement to Officer Burns: "As I was making a left hand turn into the Dunkin Donuts parking area, this passenger vehicle tried to pass me on the inside and in doing so struck the pick-up truck in the opposite lane." This statement is similarly consistent with his testimony at trial. (Compare Ex. 18 with Testimony and Cross-Examination of Ana Quinones, Halina Mitura, and Robert Leal).

19. In contrast, Quinones' testimony at trial was inconsistent with her initial statement to Officer Burns as well as with her Answers to Defendant's interrogatories. (See Ex. 18; see Ex. 9 (Quinones' Answers to Mitura's interrogatories)). Quinones provided the following statement to Officer Burns as transcribed in his Police Report: "I was going straight ahead and she hit my vehicle." This contradicts her statement in her Answers to Mitura's interrogatories that the USPS truck "suddenly and without any warning pulled away from the curb" as she was passing it, forcing Quinones to steer her vehicle away and causing the collision with Mitura. Quinones' testimony at trial presented a third version of events: that the USPS truck began to pull out from the fire lane, stopped, and suddenly began moving again, forcing her to swerve left into oncoming traffic and causing the accident.

20.     At times, Quinones' testimony suggested that she was travelling "directly behind" Leal's truck.  It is unlikely that Quinones was driving in the fire lane, especially in light of her testimony that she took the access road as a shortcut to get home quickly and there was high traffic on the road at the time.  (See PF ¶ 17; DF ¶ 3; Testimony of Ana Quinones).  This is further evidence that Leal was not in the fire lane.

21.     I find Quinones' vacillating testimony credible only to the extent that it supports the fact that she pulled across the center of the road into the lane of oncoming traffic.  (PF ¶ 31; DF ¶ 11).

22.     It further makes more sense that Leal's truck was in the normal lane of traffic waiting to turn left into the Dunkin Donuts parking lot just prior to the accident.  Leal testified that, when visiting this particular Dunkin Donuts, he would *either* park in the adjacent fire lane or take a left into the lot to park there—but not take a left from the fire lane, across the lanes of moving traffic, to park in the parking lot.  Aside from visiting the Dunkin Donuts, Quinones presented no evidence as to why Leal would drive or park on the access road.  In 2009, his mail delivery route was not on that road, and stopping for coffee or a restroom break were the only reasons he would drive there.  (PF ¶¶ 19, 21; DF ¶ 4).  Since Leal was going to visit the Dunkin Donuts, there was no reason for him to stop in the fire lane before making the turn into the parking lot.

23.     Moreover, the physical data regarding the access road supports the Defendant's theory of the accident.  In 2009, the access road was 38.5 feet across including 30 feet of travel lanes and 8.5 feet of a fire lane.  (PF ¶¶ 11-13; DF ¶ 2; Ex. 4).  Even if the

USPS truck was parked in the fire lane and suddenly moved left into the travel lane, as Quinones testified, she still should have had enough room to move to the left and pass the truck safely.  Since Quinones' vehicle was approximately 6-7 feet across with mirrors, and Mitura's truck was approximately 7-8 feet across with mirrors, there would have been ample room in the 30 feet of the road taken up by travel lanes, for the two vehicles to pass each other without colliding if the USPS truck was near the fire lane.  (See PF ¶¶ 24-35; DF ¶¶ 2, 20).  This is especially true since Leal testified, credibly, that LLVs cannot travel fast from a dead stop.  If the truck had been parked in the fire lane when Quinones first saw it, it would not have been very far into the travel lane when Quinones decided to pass, and she would have had room to avoid Mitura's car.

24.  For all these reasons, I find that the Plaintiff has failed to prove by a preponderance of the evidence that Leal was parked in the fire lane shortly before the accident.

### The Collision

25.  Quinones testified that when she saw Leal's LLV begin to turn to the left, she honked her horn, engaged her brakes, and briefly stopped behind the truck to "let him go." (PF ¶¶ 26-27).  The LLV truck did not immediately move, so Quinones then drove to the left of the truck in order to pass it.  (PF ¶ 29).  However, Leal testified that he was not aware of Quinones' vehicle until it had already begun to pass him and he was turning left, indicating that he had not heard her honk her horn.  (Cross Examination of Robert Leal).

26.  While passing the USPS truck, Quinones' vehicle traveled over the middle

of the road into the lane of oncoming traffic. (PF ¶ 31; DF ¶ 10).

27.     The front driver's side of Quinones' vehicle struck Mitura's pickup truck along the driver's side, with most of the impact to Mitura's rear bumper. (PF ¶ 35; DF ¶ 14; Ex. 14).

28.     Neither Quinones' nor Mitura's vehicles made contact with the USPS truck, which completed a left turn into the Dunkin Donuts parking lot and parked. Leal remained on the scene after the accident. (PF ¶ 36; DF ¶ 5).

29.     Leal approached Mitura after the collision and gave her his name and phone number for the purpose of being a witness to the accident. At the time, Mitura and the responding police officer, Steven Burns, considered Leal a witness to the accident. (PF ¶¶ 38, 41; DF ¶ 6. See also Ex. 11 (listing Leal as a witness in the Motor Vehicle Crash Operator Report)). At the time of the accident, Leal was not named by anyone as a cause of the accident.

## Plaintiff's Post-Incident Physical Condition

30.     Quinones was wearing a seatbelt at the time of the accident. She did not seek immediate medical assistance after the collision but went to a hospital for treatment the following day. (DF ¶ 24). According to Quinones, the accident caused the following injuries: "acute moderate/severe cervical, thoracic and thoracolumbar sprains/strains, acute post traumatic headaches and acute muscle spasm." (Ex. 9 at Answer 5).

31.     Quinones was treated at Morton Hospital and Bay Chiropractic, P.C. for her injuries stemming from the accident. She incurred medical expenses of $394.00 at Morton

Hospital and $4,512.15 at Bay Chiropractic, P.C.  (Ex. 9 at Answer 17; Ex. 10 at Answer 7.  See also Ex. 15 (medical records of Morton Hospital and Medical Center); Ex. 16 (certification by ProMedical LLC); and Ex. 17 (reports, clinical records and invoices of Bay Chiropractic PC)).

32. Quinones was involved in an automobile accident around 1999 or 2000 that resulted in a lower back injury.  (Ex. 9 at Answer 7; Ex. 10 at Answer 5).  At trial, Quinones' testimony was confused as to which accident caused which injuries, but she eventually testified that the June 2009 accident only caused headaches and pain in her neck and shoulder, and not additional back injuries.  (DF ¶ 23; Cross-Examination of Ana Quinones).

33. Defendant states but does not provide any evidence to support the theory that Quinones' injuries were "mild due to the low speed at impact and did not reasonably require thousands of dollars of chiropractic treatment."  (DF ¶ 25).  Without corroborating evidence, I find this argument unsubstantiated and accordingly accept Quinones' own estimates and testimony as to her injuries and the cost of her medical care.

34. Quinones also incurred $1,316.44 in automobile repairs at Euro Tech.  (Ex. 9 at Answer 17; Ex. 10 at Answer 7).  This estimate of automobile related bills went unchallenged by the government.

### III.  RULINGS OF LAW

1. This action was brought under the Federal Torts Claims Act ("FTCA").  The FTCA waives sovereign immunity for certain negligence claims.  28 U.S.C. § 1346(b)(1).

2.	Under the FTCA, the United States may be held liable for negligence causing personal injury to Quinones only if a private person would be liable to her under "the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). Therefore, Massachusetts law applies. See Hewitt v. United States, 550 F. Supp. 589, 591 (D. Mass. 1982).

3.	"To prevail on a negligence claim, a plaintiff must prove that the defendant owed the plaintiff a duty of reasonable care, that the defendant breached this duty, that damage resulted, and that there was a causal relation between the breach of the duty and the damage." Jupin v. Kask, 447 Mass. 141, 146, 849 N.E.2d 829, 834-35 (2006).

4.	Quinones bears the burden of proof on each element of her negligence claim. See Glidden v. Maglio, 430 Mass. 694, 696, 722 N.E.2d 971, 973 (2000). She must establish each element by a preponderance of the evidence. See Smerdon v. United States, 135 F. Supp. 929, 931 (1955) (finding that a plaintiff must sustain burden of proof by a preponderance of evidence in FTCA claim).

5.	"'By a preponderance of the evidence' means that the trier of fact had to conclude that [the allegation] was more probable than not . . . . If the proposition is as probably false as it is true, then the plaintiff has not met her burden." Cont'l Assur. Co. v. Diorio-Volungis, 51 Mass. App. Ct. 403, 409, 746 N.E.2d 550, 555 n.9 (2001) (citations omitted); see also Metro. Stevedore Co. v. Rambo, 521 U.S. 121, 137 n.9, 117 S. Ct. 1953, 1963 n.9, 138 L. Ed. 2d 327 (1997) ("'A preponderance of the evidence is . . . [e]vidence which is . . . more convincing than the evidence . . . offered in opposition to it

. . . .'" (citing Greenwich Collieries v. Dir., OWCP, 990 F.2d 730, 736 (3d Cir. 1993), aff'd, 512 U.S. 267, 114 S. Ct. 2251, 129 L.Ed.2d 221 (1994)).

6.  A driver owes others the duty to operate a motor vehicle "in a reasonably careful and prudent manner" and, "within the bounds of ordinary care," "to anticipate and provide against what usually happens and what is likely to happen[.]" Buda v. Foley, 302 Mass. 411, 413, 19 N.E.2d 537, 538 (1939) (internal quotations omitted).

7.  "Under Massachusetts law, an operator of an automobile is under a duty to exercise reasonable care in the operation of his or her vehicle." Deguio v. United States, 732 F. Supp. 1240, 1245 (D. Mass. 1990) (citing Fraser v. Flanders, 248 Mass. 62, 66, 142 N.E. 836, 838 (1924)).  Reasonable care is "the degree of care that a reasonably prudent driver would have exercised under the same driving conditions and circumstances."  Id.

8.  Quinones argues that Leal violated a Massachusetts driving statute by parking in a fire lane in breach of his duty of care.  "'A violation of a statute, ordinance or regulation . . . is evidence of negligence on the part of a violator as to all consequences that the statute, ordinance or regulation was intended to prevent.'" Deguio, 732 F. Supp. at 1245 (quoting Follansbee v. Ohse, 293 Mass. 48, 52, 199 N.E. 387, 389 (1935) (additional citations omitted)).  "Thus, if [the defendant] violated any statute or regulation enacted to assure the safety of roadways and to prevent automobile accidents, such a violation would constitute evidence of his negligence in this case."  Id.

9.     Quinones specifically contends that Leal violated Mass. Gen. Laws ch. 89, § 7A, which prohibits parking, or leaving a vehicle unattended, "within the fire lanes established by the fire department."

10.    For the reasons detailed above, Quinones has not met her burden of proving by a preponderance of the evidence that Leal parked his LLV in a fire lane in violation of the Massachusetts statute.

11.    Evidence presented at trial through witness testimony and depositions makes it more likely than not that Leal was driving in the normal lane of traffic and was *not* in the fire lane.

12.    Quinones also contends that Leal was negligent in failing to exercise due caution in looking for vehicles to the rear and side of him before pulling away from the curb. However, without proving that Leal was sitting *at* the curb, Quinones cannot prove by a preponderance of the evidence that he negligently pulled *away* from the curb without waiting for a clear path.

13.    As the driver of a vehicle on a two-way street preparing for a left turn, Leal's duty was to "do so in the lane of traffic to the right of and nearest to the center line of the roadway[, and pass] to the right of the center line of the entering way where it enters the intersection from his left." Mass. Gen. Laws ch. 90, § 14 (2013). In addition, as a vehicle being passed by another vehicle approaching from the rear, he was required to "give way . . . when practicable in favor of the overtaking vehicle, <u>on suitable and visible signal being given by the driver of the overtaking vehicle</u>, and shall not increase the speed

of his vehicle until completely passed by the overtaking vehicle." 720 Mass. Code Regs. 9.06(5) (2013) (emphasis added).

   14.   As detailed above, I find that Leal was in the proper lane for a left turn.

   15.   In addition, Quinones has not provided sufficient evidence to prove that she gave Leal a "suitable and visible signal" of her intent to pass his LLV on the left. I find credible Leal's testimony that he did not hear Quinones honk her horn and there is no evidence that Quinones signaled or otherwise made her decision to pass the truck known. I find credible Leal's testimony that he was unaware of Quinones' intent to pass him until she had already begun to pass him. See Mass. Gen. Laws ch. 90 § 14B ("Every person operating a motor vehicle, before stopping said vehicle or making any turning movement which would affect the operation of any other vehicle, shall give a plainly visible signal by activating the brake lights or directional lights or signal as provided on said vehicle . . . .").

   16.   Therefore, Quinones has not met her burden of proving that Leal was negligent in failing to exercise due caution in looking for approaching vehicles behind him before turning left into the Dunkin Donuts parking lot.

   17.   Finally, Quinones contends that Leal was negligent in failing to heed her warning of honking her horn when she saw his truck begin to move.

   18.   Quinones has not met her burden of proving by a preponderance of the evidence that she actually did honk her horn, putting Leal on notice of her vehicle behind him. Quinones' testimony that she did honk her horn is contradicted by Leal's testimony that he was unaware of her vehicle until she began passing him. Mitura also was unaware

of Quinones' intent to pass the USPS truck until the collision, which also challenges Quinones' testimony that she honked her horn. I find that Quinones has failed to establish by a preponderance of the evidence that she honked her horn.

19. The Defendant contends that Quinones was herself careless or negligent. The defendant has the burden of proving that a plaintiff failed to exercise that degree of care which an average, reasonably prudent person ordinarily exercises under like circumstances. See Hubbard-Hall Chem. Co. v. Silverman, 340 F.2d 402, 405 (1st Cir. 1965); Mass Gen. Laws ch. 231, § 85 (2013).

20. Mass. Gen. Laws ch. 231 § 85 establishes that, in Massachusetts, "[c]ontributory negligence shall not bar recovery . . . if such negligence was not greater than the total amount of negligence attributable to the person or persons against whom recovery is sought." "In other words, the plaintiff in a single-defendant case may not recover if found to be more than fifty per cent at fault." Shantigar Found. v. Bear Mountain Builders, 441 Mass. 131, 135 n.4, 804 N.E.2d 324, 328 n.4 (2004). The Defendant contends that Quinones' negligence was more than fifty percent and therefore bars her recovery.

21. Since, as this court has found, the Plaintiff has not met her burden of proving, by a preponderance of the evidence, that Leal was negligent, the issue of Quinones' own negligence does not need to be reached.

22. If, however, the issue of the Plaintiff's negligence was reached, this court would find that Quinones was more than 50% negligent. The Plaintiff passed the USPS

truck on the left, without a clear view of oncoming traffic, and without giving adequate warning of her intention to pass.  There was no reason for the Plaintiff to go around the truck other than she was in a hurry to get home.

## IV.  CONCLUSION

The Plaintiff has not proved by a preponderance of the evidence that Leal breached his duty of care and was negligent.  THEREFORE, judgment shall enter in favor of USPS and this action is DISMISSED.

                                                      / s / Judith Gail Dein
                                                     Judith Gail Dein
                                                     United States Magistrate Judge